UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

        v.

DUSTIN POST,
            Defendant.
_____

20-CR-30-LJV

**SENTENCING MEMORANDUM**

## INTRODUCTION

      Dustin Post is only 26 years old. He faces a sentence of anywhere between 15 and 160 years. At his youngest, he will be 40 or 50 years old when he is released from prison – at least half of his young life lived behind bars, in a cage. The salient question for this Court is whether it should give up on Dustin Post – a young man who grew up in horrid conditions, without a father or a supportive mother and whose brain development, likely hampered by years of neglect, would only have reached full development if he were perfectly healthy around the age of 25 – or whether, given an opportunity for counseling and intensive therapy, and given an unquestionably significant time spent serving time for actions, Dustin can still have a life on the other side.

      One approach – the one seemingly espoused by the government – posits that this Court should lock up Dustin and throw away the key. The other counters that although this Court is indeed obligated to mete out punishment and attempt to achieve deterrence, these considerations should never compel this Court to give up on a human life – especially the life of a young man who can change, a young man who has already changed.

      This latter approach, clearly the one Dustin and I believe this Court should follow, recognizes that while there are many competing considerations, sentencing must ultimately

account for "the diverse frailties of humankind," *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), and it must recognize that rehabilitation is the cardinal goal.

## DUSTIN'S SENTENCE

A.    **The guidelines offer little guidance.**

This Court knows that it may not treat the guideline range as presumptively reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable."). Rather, the range is "one factor among several" to be considered in imposing an appropriate sentence under 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," and explain how the facts relate to the purposes of sentencing. *Gall,* 552 U.S. at 49-50, 53-60. The Court's "overarching" duty is to "impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing." *Kimbrough*; 552 U.S. at 101.

The authority of this Court to disagree with a particular guideline as a matter of policy is a critical Supreme Court directive designed to ensure that the guidelines are truly advisory and constitutional.

It is a tragic misconception that deterrence rises in direct proportion, or in proportion at all, with length of sentence. Even the U.S. Department of Justice recognizes this: "Increasing the severity of punishment does little to deter crime" and "more severe punishments do not 'chasten' individuals convicted of crimes." *Five Things to Know About Deterrence*, National Institute of Justice.[1] In direct conflict with this principal, it is a stated goal of the guidelines, particularly

---

[1]     Available at https://www.ojp.gov/pdffiles1/nij/247350.pdf

2

Chapter Four, which arbitrarily elevates Mr. Post's criminal history category to V, that "[g]eneral deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence." U.S.S.G. Ch. 4., *Introductory Commentary*.

Even if that statement could be substantiated, even if the Commission could show that the DOJ is wrong and that general deterrence rises in proportion to longer prison sentences and that this sends a "clear message," the Commission's comment here clearly does not account for studies that show that "even those individuals who commit crimes at the highest rates begin to change their criminal behavior as they age," and that "[t]he data show a steep decline at about age 35." [2] While "[a] more severe (i.e., lengthy) prison sentence for convicted individuals who are naturally aging out of crime does achieve the goal of punishment and incapacitation . . . [t]hat incapacitation is a costly way to deter future crimes by aging individuals who already are less likely to commit those crimes by virtue of age." [3]

In the ordinary case, the Commission's recommendation of a sentencing range will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). The sentencing judge, on the other hand, is "in a superior position to find facts and judge their import under § 3553(a)" in each particular case. *Gall v. United States*, 552 U.S. 51, 1. Thus, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case "outside

---

[2]     *Id.* (citing Sampson, Robert. J., John H. Laub and E.P. Eggleston, "On the Robustness and Validity of Groups," Journal of Quantitative Criminology 20 (1) (2004): 37-42.)

[3]     *Id.*

3

the 'heartland' to which the Commission intends individual Guidelines to apply." *Rita*, 551 U.S., at 351.

That "rough approximation" is much more than rough in this case. It's arbitrary, inflated, and provides almost no guidance to this Court. Here, the calculations render a preposterous recommended sentence of 1,920 months, as if 1,919 months would be too few to "send a clear message" but 1,921 would be too much. Other than recognizing that the guidelines recommend an exceptionally long sentence, they simply cannot be relied on in this case to offer any concrete guidance. Highlighting this absurdity, under the PSR's calculations, if Dustin received just one fewer offense level – that is, if he were at offense level 42 instead of 43 – the low end of the guidelines would recommend a sentence *130 years or 1,560 month*s *fewer* than the current calculation. In other words, even at the inflated criminal history of V, the guidelines would recommend a sentence of 360 months at the low end, instead of 1,920. Under these guidelines, one level equals 130 years.

B.  **Tragedy begets Tragedy.**

Randy Truax's letter is telling. (Ex. B). Raised without a father and a neglectful mother, Dustin did not even know how to properly bathe himself at the age of 18 when he first met Randy. He rarely had enough food to eat as a child and had to split what was in the house with six siblings from his mother's side. Dustin essentially raised himself with no guidance whatsoever. The only role models he had were either on television, neglectful, or abusers themselves. Indeed, as Randy recounts in his letter, Dustin remembers taking baths with an older man when he was a child, and, disturbingly, he recalls his mother being in the room. In the presentence investigation report, Dustin also recounts being abused by other family members as

4

a child. (PSR, ¶ 173). In 2013, Dustin also suggested that he was molested upon being admitted to the hospital for his ongoing mental health struggles. (PSR ¶ 181). Leading to that hospital stay, Dustin had cut his own forearm, chest and face with a razor.

If part of sentencing is understanding how the circumstances of a defendant's life led him to this day, then certainly the abhorrent conditions of his childhood help to answer that question. Research has shown that stressors like these, experienced in early life, might change the parts of developing children's brains responsible for learning, memory and the processing of stress and emotion. *See* University of Wisconsin-Madison, Early Life Stress Can Leave Lasting Impacts on the Brain.[4] *See also* Madeline B. Harms, et al., Instrumental learning and cognitive flexibility processes are impaired in children exposed to early life stress (Oct. 19, 2017) ("Put together, these research findings suggest that early adversity could affect how people learn to obtain rewards in their lives. It's possible that stress disrupts the development of key brain regions that help people associate specific events or actions with positive or negative outcomes.").[5]

Dustin's self-mutilating behavior is also a reflection of childhood abuse. "The connection between childhood abuse and self-mutilating behavior is by now well documented. Repetitive self-injury and other paroxysmal forms of attack on the body seem to develop most commonly in those victims whose abuse began early in childhood. . . . Self-injury is intended not to kill but

---

[4]    *Available at* https://www.biologicalpsychiatryjournal.com/article/S0006-3223(14)00351-5/fulltext

    *Summarized at* https://news.wisc.edu/early-life-stress-can-leave-lasting-impacts-on-the-brain/

[5]    *Available at* https://onlinelibrary.wiley.com/doi/full/10.1111/desc.12596

    *Summarized at* https://theconversation.com/extreme-stress-during-childhood-can-hurt-social-learning-for-years-to-come-96884

rather to relieve unbearable emotional pain, and many survivors regard it, paradoxically, as a form of self-preservation. *See* Judith L. Herman, Trauma and Recovery: The Aftermath of Violence--From Domestic Abuse to Political Terror 109 (2015). *See also* Lori G. Plante, Bleeding to Ease the Pain: Cutting, Self-Injury and the Adolescent Search for Self 17-18 (2007) ("Many experts have concluded that the most common causal factor related to cutting and other forms of self-injury is a history of sexual abuse and trauma."); Self-Harm, Rape, Abuse & Incest National Network (RAINN), https://rainn.org/articles/self-harm ("Some survivors of sexual assault may use self-harm to cope with difficult or painful feelings.").

Dr. Heather Wood, a clinical psychologist, has studied the impact of internet sex sites and why individuals find themselves drawn to child pornography. Her research found that the following types of individuals are more than likely to be drawn to child pornography:

- Individuals who feel depressed or inadequate may use internet sex sites (which can lead to child pornography) to foster exhilaration, potency or desirability;

- Those who have experienced sexual stimulation in childhood and thus have an association between childhood and sexuality;

- Those who have been abused sexually as a child;

- Those who struggle with intimate adult relationships.

*See* Heather Wood, *Internet Pornography and Pedophilia, Psychoanalytic Psychotherapy*, (Dec. 2013).[6]

It should come as no surprise then, that Dustin was sexually abused and neglected as a child. "Child abuse and neglect appear to influence the course of development by altering many elements of biological, cognitive, psychosocial, and behavioral development; in other words,

---

[6]   *Available at* https://www.tandfonline.com/doi/abs/10.1080/02668734.2013.847851

child abuse and neglect 'get under the skin' to have a profound and often lasting impact on development." Institute of Medicine & National Research Council, New Directions in Child Abuse and Neglect Research 154 (Anne Peterson et al. eds., 2013).[7] The researchers continue, "Brain development is affected, as is the ability to make decisions as carefully as one's peers, or executive functioning; the ability to regulate physiology, behavior, and emotion is impaired; and the trajectory toward more problematic outcomes is impacted." *Id.*

There can be little dispute that the tragic circumstances of Dustin's upbringing played a critical role in leading to the tragic acts for which he is now being sentenced.

**C.     Hope.**

The other question that lies at the heart of every sentencing looks not backward (why did this happen?) but forward: When released from prison, will Dustin Post reoffend, or will he finally have the chance to live a productive and meaningful and crime-free life?

No one, of course, can answer that question definitively. But Dustin's own mindset is a strong indicator that he is on the right path.

Dustin has matured profoundly in the two years that he spent in detention on this case. In his letter to this Court (Ex. A), he expresses his genuine understanding of the crimes that he committed. He does not minimize or place blame elsewhere. Most tellingly, he demonstrates empathy for his victims, and recognizes that he has caused great and lasting pain. Dustin writes, "I wish guilt had the power to turn back the wheel of time to make right my wrong . . . The guilt and remorse I feel will never be enough to make what I did [] right again. I struggle living with

---

[7]     *Available at* https://www.ils.ny.gov/files/New%20Directions%20in%20Child%20Abuse%20and%20Neglect%20Research%20Petersen%20et%20al%202014.pdf

the fact tthat I had essentially taken a person's joy and innocence and replaced it with distrust and fear." (*Id*.). As a whole, Dustin's letter demonstrates a deep sense of self-awareness and recognition of the wrongfulness of his actions. This is powerful coming from a young man with a learning disability who was never taught these qualities.

Dustin has not just said the right things, though, he has also done the right things. Dustin converted to Christianity and has dedicated himself to scripture. As Dustin himself writes – again with a powerful sense of self-awareness – "my rehabilitation has already begun." (*Id*).

Most importantly, Dustin wants to change. Very early in one of my first meetings with Dustin at Niagara County Jail, he told me that he desperately wanted to engage in therapy. And once again, he has acted on that desire – completing just about every program that the county jail offers. He has taken parenting classes, where he "actively participates" and has been "cooperative and attentive." (Ex. D.). He has taken Bible correspondence classes and received certificates demonstrating successful completion. (Exs. E-F).  He has engaged with counselors in therapy sessions at the jail.

In fact, Dustin's change probably began even before his time in jail; it likely began the day that police officers knocked on his door. Dustin was not defensive or evasive. Speaking with the officers for well over an hour, Dustin was exceptionally cooperative. He gave the officers all his electronic devices, providing passwords and even going to great lengths to unlock one device through the cloud. The next week, he went to the Fredonia State Police barracks and voluntarily participated in a polygraph examination.[8] Before the examination even began, Dustin voluntarily

---

[8] During the initial stage of the examination, Dustin was asked to read aloud his consent form. He struggled to pronounce certain words and the trooper had to explain what the words "subsequent" and "physiological" meant.

8

admitted to the incidents that are recounted in the PSR and that make up the charges against him. This interview lasted a full six hours.

Further, "the single best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return.  Studies have shown that prisoners who maintain family ties during imprisonment are less likely to violate parole or commit future crimes after their release than prisoners without such ties."  Solangel Maldonado, Recidivism and Parental Engagement, 40 Family L. Q. 191 (2006).[9]

It is both fortunate and unfortunate that Randy Truax found his way into Dustin's life. Had the two met just a few years earlier, there is good reason to believe that Dustin would not have found himself in this position. Randy is the first person in Dustin's life to show him love and to care for him. The two remain in close contact, and his presence and guidance in Dustin's life, even though Dustin will be behind bars, is a critical factor in the hope for Dustin's future.

There are also more general reasons why there is reason to hope for Dustin.

First, it is well documented recidivism rates decline with age.  *See* U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, Ex. 9 (2004).[10] When he will be released from prison, Dustin will be significantly older.  Even more to the point, sexual criminal behavior declines with age. "Among male sex offenders, decreased rates of sexual offending may be a result of reduced sexual drive related to age-related disease and decreases in testosterone.  (Barbaree & Blanchard, 2008; Hanson, 2002).[11]  As well, low

---

[9]    *Available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1789898

[10]    *Available at* https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines

[11]    Available at https://psycnet.apa.org/record/2008-02580-003

self-control and impulsivity are related to risk of sexual and other types of criminal recidivism, and as individuals age, self-control increases and impulsivity decreases (Gottfredson & Hirschi, 1990; Hanson, 2002; Prentky, Knight, Lee, & Cerce, 1995)." Michael Lasher & Robert McGrath, Desistance from Sexual and Other Violent Offending Among Child Sexual Abusers, 20 Crim. Justice & Behav. (2016).[12]

Finally, as many courts have recognized, collateral consequences of conviction, such as registration as a sex offender and psychological effects of imprisonment, are relevant to sentencing. *See*, *e.g.*, *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (acknowledging that defendant's probationary sentence also included his registration as a sex offender, travel restrictions, internet restrictions, therapy requirements, computer restrictions, and other negative consequences); *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender). When Dustin will be released from prison, he will be a registrable sex offender for life, with dozens of restrictions on his liberty, including his liberty to choose where he lives, with whom he associates, and where he works. These restrictions are properly considered in contemplating the § 3553(a) factors.

Indeed, Dustin will be sentenced to a minimum of 15 years' incarceration with the possibility of much more. He will be on supervised release up to life. He will register as a sex offender under the Sex Offender Registration and Notification Act. If Probation's recommendations are accepted, he will participate in a sex-offense specific treatment program;

---

[12] *Available at* https://journals.sagepub.com/doi/abs/10.1177/0093854816670194

he will be subject to randomized polygraph testing; he will not be allowed to use any computer, data storage device or any internet capable device without the authorization of this Court, or the U.S. Probation; if he is authorized to use an electronic device, U.S. Probation may install any application to surveil his activity, if anything "suspicious" occurs on those devices, he must consent to and cooperate with "unannounced examinations" of any electronic device, including the search of "all data," he will have to turn over any "personal and/or business financial information" to U.S. Probation, he will not be allowed to have any contact with anyone under 18 years old, if he has children, he will be able to pick them up from school only if Probation allows him to. United States Probation considers that all these proposed special conditions serve the statutory sentencing purpose of deterrence, public protection and rehabilitation.

  Recognizing this, and understanding that Dustin's liberty will be significantly restrained for at least the next 15 years and possibly much longer, this Court need not impose an extended sentence of incarceration for many of the § 3553(a) factors – including punishment, incapacitation, deterrence and protection of the public. In fact, defense counsel believes that the government will be asking for a life sentence. To the extent this Court considers that in an effort to protect the public, such a sentence is unnecessary because Congress has already provided for civil commitment for those for whom it is deemed necessary. This is not a task that is assigned to this Court, and the civil commitment process will happen whenever this Court's sentence expires. Thus, this Court need not be burdened by the governments' request to protect the public indefinitely. That decision rests with others, and with Dustin as he shows his rehabilitation over the next decades.

## CONCLUSION

A mandatory minimum (yet still exceptionally long) sentence is sufficient but not greater than necessary. Dustin was between the ages of 17-24 at the time he committed these crimes – an adolescent in terms of cognitive development. His upbringing meant that he never truly had a chance in this world. We ask this Court give him one now.

***

Attached to this Memorandum are the following exhibits submitted for the Court's consideration:

**Exhibit A:**   Letter written by Dustin J. Post;

**Exhibit B:**   Letter written by Randy Truax, adoptive father;

**Exhibit C:**   Crossroads Certificate of Achievement;

**Exhibit D:**   Letter written by Suzanne D. Cassick, LMSW, Program Supervisor at Pinnacle Community Services;

**Exhibit E:**   Steppingstones to God Certificates of Completion, and The First Step Certificates of Completion;

**Exhibit F:**   Letter written by Stan Miller, English Correspondence Department, Lamp and Light Publishers, Inc.

DATED:  Buffalo, New York, January 20, 2022.

Respectfully submitted,

**/s/ Jeffrey T. Bagley**
Jeffrey T. Bagley
Assistant Federal Public Defender
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York 14202
(716) 551-3341, (716) 551-3346 (Fax)
jeffrey_bagley@fd.org
*Attorney for Defendant Dustin Post*